United States District Court
Middle District of Florida
Jacksonville Division

**HOPE LEANN MILLER,**

> *Plaintiff,*

V.                                                       **NO. 3:17-CV-673-J-34PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

> *Defendant.*

---

## Report & Recommendation

This is a case under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Commissioner of Social Security denying Hope Leann Miller's claims for disability insurance benefits and supplemental security income.[1] Miller seeks reversal and remand, raising three issues: (1) whether the Administrative Law Judge ("ALJ") erred by failing to analyze Miller's borderline personality diagnosis and the impact of her borderline personality on her functioning; (2) whether the ALJ erred in failing to reconcile Miller's residual functional capacity ("RFC") with opinions of state agency medical consultants; and (3) whether the ALJ erred by failing to provide good cause for rejecting Miller's treating psychiatrist's opinions. Doc. 20. The

---

[1]The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906, 416.1400−416.1406. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918, 416.1407−416.1418. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943, 416.1429−416.1443. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982, 416.1466−416.1482. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. §§ 404.981, 416.1481.

Commissioner contends there is no error, much less error warranting reversal and remand. Doc. 22.

## I.    Background

Miller was born in 1972. Tr. 274. She completed one year of college, Tr. 313, obtained a certificate in computerized accounting, Tr. 37, and worked as an account technician for the Duval County School Board, Tr. 304. She last worked in September 2011. Tr. 313. She alleges she became disabled at that time from post-traumatic stress disorder, bipolar disorder, anxiety disorder, chronic neck pain, and migraine headaches.[2] Tr. 69. She proceeded through the administrative process, failing at each level. Tr. 1, 86, 105, 107–08, 132, 155, 744. This case followed. Doc. 1.

## II.   ALJ's Decision

The ALJ conducted a hearing on February 1, 2016, at which Miller was represented by counsel. Tr. 29. The decision under review is the ALJ's decision dated March 1, 2016. Tr. 762. The time period for disability insurance benefits is September 2011 (the alleged onset date) to December 2013 (the date last insured). The time period for supplemental security income is April 2013 (the application date) to March 2016 (the date of the ALJ's decision).

At step one,[3] the ALJ found Miller has not engaged in substantial gainful activity since September 3, 2011 (the alleged onset date). Tr. 750.

---

[2]Miller previously applied for benefits in 2009. Tr. 70. An ALJ denied the claims in September 2011. Tr. 70. The Appeals Council denied review in February 2013. Tr. 70. In the present case, the ALJ ruled, "[T]his case is res judicata through September 2, 2011, the date of the prior [ALJ] decision. A discussion of any medical evidence prior to that date is for historical purposes only and is not to be construed as a reopening of the prior applications, which are now final and binding under the doctrine of res judicata." Tr. 753. The ALJ's decision in the earlier case is in the record. Tr. 161–78. Miller does not contest the res judicata ruling.

[3]The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment or combination

At step two, the ALJ found Miller suffers from severe impairments of lumbar degenerative disc disease, cervical degenerative disc disease, headaches, bipolar disorder, post-traumatic stress disorder, anxiety disorder, and depressive disorder. Tr. 750.

At step three, the ALJ found Miller has no impairment or combination of impairments that meets or medically equals the severity of any impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 750. He considered the "paragraph B" criteria and found she has mild restrictions in activities of daily living; marked difficulties in social functioning; and moderate difficulties maintaining concentration, persistence, and pace; and observed she has had no episode of decompensation of extended duration. Tr. 750–51. He also considered the "paragraph C" criteria and found she does not meet them.[4] Tr. 751.

After stating he had considered the entire record and summarizing the medical evidence, the ALJ found that Miller has the RFC to perform light work[5] with additional limitations:

---

of impairments meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her RFC, and (5) there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

[4]The paragraph B criteria are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 §§ 12.04, 12.06. Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A).

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20

[N]o more than occasional use of foot controls and overhead reaching; no climbing of ladders and scaffolds; no crawling; no more than occasional climbing of ramps and stairs, and kneeling; no more than frequent balancing, stooping, and crouching; no work around unprotected heights or moving mechanical parts; no environment where there are temperature extremes; limited to simple tasks, simple work-related decisions with no more than occasional interaction with co-workers and supervisors, and no interaction with the public; in addition to normal breaks, will be off task up to 5% of the workday; and requires a sit/stand option, which allows a change of position at least every 30 minutes, which is a brief positional change lasting no more than 3 minutes at a time, remaining in the work station.

Tr. 752.

At step four, the ALJ found Miller cannot perform her past relevant work.[6] Tr. 760.

At step five, the ALJ found Miller can perform the jobs of warehouse checker, assembler (small parts), and labeler, and those jobs exist in significant numbers in the national economy. Tr. 761. The ALJ therefore found no disability. Tr. 761–62.

## III.   Doctors' Opinions

### A.   *State Agency Consultant Opinions*

In June 2013, state agency psychiatrist James A. Brown, Ph.D., reviewed Miller's disability application at the initial level and provided a mental RFC.[7] Tr. 79–85. He listed the medical evidence he had reviewed and provided a summary: "[Miller] has a considerable history of MORE THAN NOT SEVERE mental impairments including Bipolar D.O., Personality D.O. – Cluster B traits and allegations of PTSD.

---

C.F.R. §§ 404.1567, 416.967(b).

[6]"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. §§ 404.1560, 416.960.

[7]The same information is copied at Tr. 88–106.

However, functionality still remains, she shops, goes out on occasion, takes Taxi and apparently does some household chores on occasion. Claimant is capable of [simple routine tasks]. SEE [mental RFC]."[8] Tr. 79 (emphasis in original).

On understanding and memory limitations, Dr. Brown opined Miller is not significantly limited in her ability to remember locations, work-like procedures, and very short and simple instructions. Tr. 83. He opined she is moderately limited in her ability to understand and remember detailed instructions and explained that "anxiety levels may negatively impact memory." Tr. 83.

On sustained concentration and persistence limitations, Dr. Brown opined Miller is not significantly limited in her ability to carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions. Tr. 83–84. He opined she is moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 83–84. He opined that "anxiety issues [and] mood instability may negatively impact [concentration and persistence]." Tr. 84.

On social interaction limitations, Dr. Brown opined Miller is not significantly limited in her ability to ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

---

[8]"The personality disorders are grouped into three clusters based on descriptive similarities. … Cluster B includes antisocial, borderline, histrionic, and narcissistic personality disorders." Diagnostic and Statistical Manual of Mental Disorders 646 (5th ed. 2013).

maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. Tr. 84. He opined she is moderately limited in her ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors. Tr 84. He opined she has no limitations in "adaptation." Tr. 84.

Under "Additional Explanation," on understanding and memory, Dr. Brown opined Miller's work history and objective observations indicate a "capacity to understand and retain simple instructions." Tr. 84. On sustained concentration and persistence, he observed she may have challenges, "on occasion, persisting at tasks within physical tolerances and skill levels for 2 hour periods in an 8 hour day with regular breaks and normal levels of supervision." Tr. 84. On social limitations, he observed she "can cooperate on simple routine tasks and transactions. Can usually accept directions and feedback in general. Less active socially but able to relate somewhat despite unwillingness to talk. Social interactions are harder for this claimant than their peers." Tr. 85. On adaptation, he observed her skills are adequate and independent, and she could avoid hazards and arrange transportation. Tr. 85. He noted she has no recent history of psychiatric hospitalizations or decompensation. Tr. 85. He opined: "Claimant can understand, retain and carry out simple instructions. Claimant can consistently and usefully perform routine tasks on a sustained basis with minimal (normal) supervision."[9] Tr. 85.

In September 2013, state agency psychiatrist Jorge Pena, Ph.D., reviewed Miller's mental medical evidence at the reconsideration level.[10] Tr. 128–30. Dr. Pena listed the same levels of limitations ("not significantly limited" or "moderately limited") as Dr. Brown had and explained the limitations. Tr. 128–30. On understanding and memory, he opined she is "capable [of] remembering simple

---

[9]A physical RFC was provided by a single decision-maker and not a physician. Tr. 80–83.

[10]Dr. Pena's observations and mental RFC are copied at Tr. 151–53.

locations and work like procedures but may experience occasional difficulty retaining detailed instructions." Tr. 130. On sustaining concentration and pace, he opined she is "generally capable of sustaining concentration and persistence but may experience occasional difficulty carrying out detailed instructions, maintaining attention for extended periods of time, finishing tasks on schedule and completing consistently a normal work week as a result of interfering emotional responses, lack of motivation[,] and physical issues." Tr. 130. On social limitations, he opined she "does not show obvious signs of psychosis, is able to communicate with others and can interact adequately but may experience occasional difficulties responding to criticism and getting along with coworkers as a result of interfering emotional responses, an egocentric stance and a low frustration tolerance threshold." Tr. 130. He opined she can respond adequately to situations that require adaptation. Tr. 130. He further opined:

> [Miller] shows signs of depression and anxiety but appears to be stable on meds and indicates she is capable of managing [activities of daily living], relating to others, shopping independently, caring for her 3 years [sic] old daughter and doing other everyday tasks with limitations related to physical factors. The evaluators do not note any obvious signs of confusion or severe disturbance. [She] is mentally capable of performing simple, work related tasks that do not interfere with possible physical limitations but will continue to benefit from psychiatric and psychological assistance.

Tr. 130.

In October 2013, state agency physician Debra Troiano, M.D., reviewed Miller's physical medical evidence at the reconsideration level.[11] Tr. 126–28. She opined Miller can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk with normal breaks for 4 hours, sit with normal breaks for 6 hours, and push and pull the same amount she could lift and carry. Tr. 126–27. Dr. Troiano summarized medical evidence and stated the RFC was reduced to

---

[11]Dr. Troiano's RFC is copied at Tr. 149–51.

"compensate for the impairments and associated pain." Tr. 127. She opined Miller can occasionally (one third of the workday) climb ramps or stairs, kneel, and crouch; never climb ladders, ropes, or scaffolds; and balance, stoop, and crawl an unlimited amount. Tr. 127. She opined Miller has no manipulative, visual, or communicative limitations. Tr. 138. She opined Miller should avoid concentrated exposure to extreme cold or heat, humidity, noise, fumes (and odors and dusts, etc.), and hazards. Tr. 128. She opined Miller has no environmental limitations concerning vibration or wetness. Tr. 128. She explained she gave environmental limitations to avoid exacerbating Miller's degenerative disc disease and headaches. Tr. 128.

To explain the RFC, Dr. Troiano stated, "[Miller's] allegations are consistent with [medical evidence of record] and appear fully credible. … Due [to] her well documented spasm and pain in cervical and lumbar spine with documented [degenerative disc disease], walking should be limited to 4 hours per work day." Tr. 128.

About the state agency medical consultants' opinions, the ALJ stated:

> [T]he [ALJ] has considered the opinions of the State agency medical consultants and gives them some weight (Exhibits B-1A [Dr. Brown], B-2A [Dr. Brown], B-7A [Drs. Pena and Troiano], and B-8A [Drs. Pena and Troiano]). The undersigned notes these consultants are a highly qualified physician and psychologist who are experts in the evaluation of the medical issues in disability claims under the Social Security Act. Furthermore, the opinions are supported by detailed explanation, rationale, and analysis of the medical evidence of record. However, evidence received subsequent to these reviews document greater limitations in regard to social functioning as well as greater nonexertional physical limitations.

Tr. 759.[12]

---

[12]Exertional limitations are limitations on strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). Nonexertional demands are limitations on other demands like difficulty in seeing or hearing, maintaining attention or concentration, tolerating dust or fumes, or reaching and handling.

### B.    Dr. Taylor's February 2013 "Mental Impairment Questionnaire"

In February 2013, Phyliss N. Taylor, M.D., completed a "Mental Impairment Questionnaire." Tr. 597–600. She reported that she had seen Miller every three months since June 2011. Tr. 597. For "Axis I,"[13] she wrote "Bipolar/PTSD/Anxiety"; for "Axis II," she wrote "Deferred." Tr. 597. She listed the current Global Assessment of Functioning ("GAF") rating and highest GAF rating in the past year as 41 to 50.[14]

---

20 C.F.R. §§ 404.1569a(c)(1)(i)–(vi), 416.969a(c)(1)(i)–(vi).

[13]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV") organizes diagnoses into the following categories: Axis I (psychological diagnostic categories except mental retardation and personality disorders); Axis II (mental retardation and personality disorders); Axis III (general medical conditions, acute medical conditions, and physical disorders); Axis IV (psychological and environmental factors contributing to the disorders); and Axis V (the Global Assessment of Functioning).

[14]The DSM-IV includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32–34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id*. A GAF rating of 21 to 30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. Manual at 34. A GAF rating of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. Id. A GAF rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id*. A GAF rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*. A GAF rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id*.

The latest edition of the Manual abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

In July 2013, the Social Security Administration issued Administrative Message (AM)-13066, revised effective October 14, 2014, providing its adjudicators, including ALJs, with internal guidance regarding the interpretation of GAF ratings. AM-13066 acknowledged the latest edition of the Manual eliminated the use of GAF ratings but confirmed that adjudicators will continue to consider GAF ratings as opinion evidence. As with other opinion evidence, however, a GAF rating needs supporting evidence to be given much weight. According to AM-13066, "the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." The Social Security Administration cautions that a GAF rating "is never

Tr. 597. She listed Miller's medications and, next to "Treatment and Response," opined, "Patient has failed multiple trials of psychotropics [with] lack of effect or adverse side effects. She has not shown significant improvement with counseling. Moods and anxiety are still uncontrolled." Tr. 597.  On side effects of medication, she noted Miller experienced sedation, lethargy, decreased focus and concentration, and delayed reaction time. Tr. 597. To describe the clinical findings to support the severity of impairments, she stated, "Labile (depressed, anxious, and irritable) moods; anxious affect; pressured or rapid speech; impulsive thought process; auditory hallucinations and flashbacks of past trauma; distractable cognition; psychomotor agitation; limited to poor insight and judgment; [and] negative mental outlook/attitude." Tr. 597. She opined Miller's prognosis was "guarded to poor." Tr. 598.

From a checklist, Dr. Taylor checked that Miller exhibits various signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent recollections of a traumatic experience; psychomotor agitation or retardation; persistent disturbances of mood or affect; apprehensive expectation; paranoid thinking; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods; hallucinations or delusions; hyperactivity; motor tension; emotional lability; manic syndrome; vigilance and scanning; pressures of speech; easy distractibility; short-term memory impairment; sleep disturbance; decreased need for sleep; recurrent severe panic attacks; and "involvement in activities that have a high probability of painful consequences which are not recognized." Tr. 598. Dr. Taylor stated Miller does not have a low IQ and her psychiatric conditions do not exacerbate physical symptoms. Tr. 599. She opined Miller has moderate limitations in activities

---

dispositive of impairment severity," and an ALJ should "not give controlling weight to a GAF [rating] from a treating source unless it is well[-]supported and not inconsistent with the other evidence."

of daily living; marked limitations in maintaining social functioning and concentration, persistence, or pace; and has had three repeated episodes of decompensation within a 12-month period, each lasting at least 2 weeks. Tr. 599. From a checklist, she marked that Miller has a "medically documented history of a chronic organic mental, schizophrenic, [or] affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and … three episodes of decompensation within 12 months, each at least two weeks long." Tr. 599–600. She opined Miller would be absent from work more than 4 days a month. Tr. 600. She opined Miller's impairment could be expected to last at least 12 months and Miller is not a malingerer. Tr. 600. She opined Miller could manage benefits in her own best interest. Tr. 600. Concerning additional reasons Miller would have difficulty working at a regular job on a sustained basis, she reported that Miller "has been unable to obtain steady employment since [2008 and] [has an] unstable mental condition." Tr. 600.

About Dr. Taylor's February 2013 Mental Impairment Questionnaire, the ALJ stated:

> The Administrative Law Judge has considered the opinion of Dr. Taylor and gives it some weight (Exhibit B-13F). As noted above, Dr. Taylor has a treatment history with the claimant, however, her opined severity regarding restrictions in activities of daily living, deficiencies in concentration, persistence, or pace, and episodes of decompensation are not supported by objective medical findings. Furthermore, her noted "signs and symptoms" regarding difficulty thinking or concentrating and memory impairments are not supported by her treatment notes until December of 2015; and her treatment notes do not document any involvement in activities that have a high probability of painful consequences. As discussed below, the claimant has described activities of daily living, which are not entirely limited. The undersigned also notes that treatment notes from Dr. Taylor show the claimant's cognition/memory has been grossly intact except for a couple of occasions. Furthermore, despite the fact that the claimant's thought processes have been noted as rapid, circumstantial, and impulsive, more recent treatment notes show they are more organized and logical. The

11

undersigned also notes that, during the claimant's most recent visit in December of 2015, Dr. Taylor noted the claimant had a history of partial compliance with medications and outpatient counseling. Furthermore, the evidence of record does not document any hospitalizations or ER visits for any mental health related symptoms and treatment with Dr. Taylor has been routine in nature.

Tr. 759 (internal citations omitted).

About the GAF ratings by Dr. Taylor, the ALJ stated:

With respect to the question of the GAF scores, which is a "medical opinion" as defined in 20 C.F.R. Section 404.1527(a)(2) and 416.927(a)(2) and must be considered with the rest of the relevant evidence, the undersigned generally gives less weight to a specific GAF score than to the bulk of the other, more convincing evidence. Per DSM-IV, American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, GAF scores between the range of 31-40 indicates some impairment in reality testing or communication OR major impairment in several areas; and GAF scores between the range of 41-50 indicates severe symptoms OR a serious impairment in one area of functioning. The evidence of record shows the claimant has been assigned GAF scores between 31 and 50.

…

The undersigned notes that a GAF score represents a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time; a GAF score may vary from day to day, from time to time, and between practitioners; a GAF score does not provide a reliable longitudinal picture of an individual's mental functioning; a GAF score is only a snapshot opinion about the general overall level of functioning; a GAF score does not predict prognosis or treatment outcomes; and a GAF score does not directly correlate to the severity requirements in the Social Security mental disorder listings. Furthermore, a GAF rating may indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone without further explanation, the rating does not evidence an impairment seriously interfering with a claimant's ability to work. Therefore, the undersigned gives little weight to the GAF scores in this case.

Tr. 759–60 (internal citations omitted).

12

C.    *Forms from Drs. Taylor and Jaime Revollo, M.D.*

In September 2011, to cover Miller's transportation to doctor visits, Dr. Taylor completed a "Certification of Need for Transportation by Taxi Cab" form for Medicaid. Tr. 488. The certification explains Miller has "a medical condition or disability that would prevent [her] from accessing or utilizing the bus system" and the condition or disability is permanent. Tr. 488.

In March 2013, Dr. Taylor wrote the following letter, addressed "To Whom it May Concern":

> Ms. Hope Miller (DOB: 7/22/72) is under my psychiatric care for the treatment of Bipolar Disorder, Post Traumatic Stress Disorder, and Generalized Anxiety Disorder. She has severe mood instability with depression, irritability, and agitation. She has uncontrollable crying spells, panic attacks, and passive suicidal ideation. Her daily functioning is severely impaired by her current psychiatric problems. She has not responded to recent medication changes but has been compliant with medications. She has been attending psychotherapy with Andrew Goetzman, LMHC at Northwest Behavioral ·Health for over one year to help improve coping skills. The patient also has several ongoing co morbid [sic] medical conditions including migraine headaches and chronic back pain that worsen her prognosis. Due to the severity of her psychiatric illness, she is unable to maintain gainful employment at this time. She is a single parent and living in public housing. Her family has been able to help financially in the past, but are no longer able to support her. The patient last worked in June 2008 but had to stop working due to her medical and psychiatric illness. Please consider allowing her to receive disability benefits to meet her financial obligations.

Tr. 486. The letter is an exact copy of an earlier letter from June 2011. Tr. 499.

While treating Miller, Drs. Taylor and Jaime Revollo, M.D., completed several "Medical Verification" forms.[15] Tr. 489–99. Dr. Taylor completed the same form in March 2011, September 2011, February 2012, July 2012, November 2012, May 2013,

---

[15]Dr. Revollo appears to be a primary care physician. Tr. 500–19, 557–63.

September 2013, April 2014, August 2014, and March 2015, each time opining Miller suffers from bipolar disorder and PTSD (and sometimes adding generalized anxiety disorder); cannot work, volunteer, or go to school; and her conditions are permanent.[16] Tr. 489–94, 609, 611–13. In the February 2012 form, Dr. Taylor adds that Miller is "unable to tolerate stress of work and interact appropriately with others." Tr. 492. Dr. Revollo completed the same form in June 2012, December 2012, May 2013, February 2015, and March 2015, each time opining Miller suffers from chronic pain syndrome and PTSD (and sometimes adding headaches); cannot work, volunteer, or go to school; and her conditions are permanent.[17] Tr. 495–97, 610.

About Dr. Revollo's treatment of Miller, the ALJ stated:

Medical records from Family Medical Center Riverside (Ja[im]e Revollo, M.D.) covering the period August of 2012 through July of 2013 show that the claimant was diagnosed with cough, muscle spasm, systolic murmur, chronic back pain, elevated blood pressure, second degree burn to posterior thigh, hypertension and edema secondary to burn (resolved), allergic rhinitis, hyperlipidemia, pharyngitis, bronchitis, post-traumatic stress disorder, irregular menses, tobacco abuse, obesity, sinusitis, dyslipidemia, depression, and anxiety. These examinations do not document any musculoskeletal or psychiatric abnormalities (Exhibits B-7F and B-10F).

Tr. 756.

About Dr. Taylor's letter and forms and Dr. Revollo's forms, the ALJ stated:

The [ALJ] has considered the opinions of Dr. Taylor and Dr. Revollo and gives them little weight (Exhibits B-6F and B-15F). The undersigned notes that both of these physicians have a treatment history with the claimant; however, they do not provide any specific limitations. Furthermore, statements that the claimant is disabled, unable to work,

---

[16]Some forms also include basic statements on whether Miller was attending monthly counseling or medication management appointments with other medical professionals. *See, e.g.*, Tr. 611–13.

[17]Dr. Revollo signed the same form in August 2011 but it has no diagnoses or limitations marked and only states "referral to pain management." Tr. 498.

can or cannot perform a past job, meets a Listing or the like are not medical opinions, but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner who cannot abdicate the statutory responsibility to determine the extent to which they are supported by the record.

Tr. 759.

### D.   *Miller's Statements*

About Miller's statements, the ALJ stated:

First, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. At one point or another in the record, the claimant has reported the following activities: doing laundry and household chores, being the primary caretaker of her daughter who is currently 6-years-old, shopping twice a month, driving twice a week, occasionally taking a taxi, watching television, walking her daughter to and from the bus stop, cooking, and paying her bills.

…

Second, although the claimant has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been somewhat successful in controlling her symptoms when she is compliant. However, there is evidence of non-compliance with narcotic contract multiple times, and only partial compliance with psychotropic medications and outpatient counseling. Furthermore, examinations and diagnostic testing do not document any objective medical findings that would prevent the claimant from performing work activity within the established residual functional capacity.

…

Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive appearance and demeanor while testifying at the hearing. It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual

15

functional capacity. The undersigned notes the claimant portrayed no evidence of pain or discomfort while testifying at the hearing. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

Tr. 760.

## IV.    Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* A court must affirm an ALJ's decision if substantial evidence supports it, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## V.    Law & Analysis[18]

To obtain benefits, a claimant must demonstrate she is disabled. 20 C.F.R. §§ 404.1512(a); 416.912(a). A claimant is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).

---

[18]The Commissioner revised regulations on the consideration of medical evidence for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017). Miller filed her claims before that date. All citations are to the regulations in effect when she filed her claim.

16

An ALJ must consider all relevant record evidence. 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The Social Security Administration uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). The ALJ need not defer to any medical opinions concerning the RFC. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

## A.   *Borderline Personality Disorder*

Miller contends the ALJ erred by failing to list her diagnosis of borderline personality disorder as a severe impairment at step two and by failing to address or analyze the disorder in combination with other impairments.[19] Doc. 20 at 14–18. The Commissioner disagrees. Doc. 23 at 8–11.

"Step two is a threshold inquiry," *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir. 1986), acting as a "filter" to eliminate claims involving no substantial impairment. *Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987). "[T]he finding of

---

[19]Because Dr. Taylor did not diagnose borderline personality disorder until December 2013, it is not listed on her medical questionnaire or letter. Tr. 486, 597–600. The diagnosis is also not listed on any of her later medical verification forms, some of which postdated the diagnosis (they appear to only list the Axis I diagnoses). Tr. 489–94, 609, 611–613.

any severe impairment ... whether or not it results from a single severe impairment or a combination of impairments" satisfies step two. *Id.*

An ALJ need not identify at step two all of the claimant's impairments that are severe but must demonstrate he considered all of the claimant's impairments—severe and non-severe—in combination at step three and in assessing the RFC. *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Here, at step two, the ALJ identified several severe impairments: lumbar degenerative disc disease, cervical degenerative disc disease, headaches, bipolar disorder, post-traumatic stress disorder, anxiety disorder, and depressive disorder. Tr. 750. Even assuming Miller's borderline personality disorder is a severe impairment, any failure to include it at step two is harmless because the ALJ found she has other severe impairments and moved past step two. *See Jamison*, 814 F.2d at 588.

After moving past step two, the ALJ considered the effects of Miller's borderline personality disorder in combination with her other impairments. He twice noted the diagnoses from Dr. Taylor. Tr. 756, 758. He noted other medical records describing labile mood (wild, uncontrolled mood swings). Tr. 754, 755, 757. He noted a consulting psychiatrist's statement that "maladaptive personality traits ... are contributing to her difficulties." Tr. 754. He noted Miller's own report of "multiple personalities." Tr. 756. He gave some weight to Dr. Brown's opinions, in which Dr. Brown noted "Personality D.O. – Cluster B traits" and accounted for the symptoms of that and other disorders in mental limitations. Tr. 758–59. And after considering all of the evidence, he determined an RFC that included numerous mental limitations: only simple tasks, only simple work-related decisions, no more than occasional interaction with co-workers, no more than occasional interaction with supervisors, no interaction with the public, and her ability to be off-task up to 5 percent of the

18

workday beyond normal breaks. Tr. 752. Substantial evidence, as detailed in the Commissioner's brief, Doc. 23 at 7–8, supports the mental RFC.[20]

---

[20]The Commissioner details the following evidence supporting the mental limitations of the RFC:

1.  Miller's medical history (Tr. 42-43, 753) (observing that she was diagnosed with depression as a child and put on medication as early as 18 years old);

2.  Abnormal medical signs (Tr. 467, 469, 471, 473, 475, 477, 479, 547, 550-51 701, 704-05, 707-08, 710, 712, 714, 737, 750-51, 754-58) (citing [Miller's] pressured speech, anxiety, depression, and irritable mood; that [Miller] was labile, apprehensive, tearful, and had an agitated affect and psychomotor agitation; and had conflicts with some family, friends, and neighbors);

3.  Normal clinical findings and the reduction/lessening of abnormal signs (Tr. 469, 471, 473, 475, 477, 479, 520, 525, 539, 547, 551, 566, 572, 576, 580, 588, 605, 618, 629, 644, 650, 669, 672, 675, 678-79, 681, 684, 687, 695, 698, 701, 705, 708, 713, 722, 724, 727, 730, 736, 738, 742, 751, 753-756, 758), such as the fact that her cognition/memory was grossly intact; she was alert and oriented; and that while her thought process has been noted as rapid, circumstantial, and impulsive, they have also been seen as organized and logical; her memory was intact; by October 2011, her mental status examination showed she was only anxious; by February 2012, May 2012, October 2012, March 2013, June 2013, April 2014, and December 2015, her examinations were unremarkable except she had labile affect, anxious or irritable mood, and agitated psychomotor activity and/or impulsive thought process; and whether examinations revealed any psychiatric abnormalities;

4.  [Miller's] diagnoses (Tr. 443, 453, 468, 472-80, 551, 695, 698, 702, 705, 708, 710, 713, 742, 753, 754-55, 756, 758) (citing depression, bipolar depression, anxiety disorder, post-traumatic stress disorder, and borderline personality disorder; whether and when the diagnoses changed);

5.   [Miller's] treatment (Tr. 235, 316, 318-21, 366-67, 375-76, 386, 401,430, 520, 525, 531, 641, 672, 737, 751, 753, 754) (citing [her] partial compliance with medications and outpatient counseling; the lack of hospitalizations and ER visits for any mental health related symptoms, her routine treatment, and Dr. Saleh's referral to her psychiatrist for her psychiatric problems);

6.  Personal observations (Tr. 429, 754, 758) (comparing the above clinical signs against [Miller's] personal observations about her symptoms, such as a prior history of crying spells, depression, anger, anxiety, mood swings, multiple personality issues, hallucinations, racing thoughts,

In contending that the ALJ reversibly erred by failing to list her diagnosis of borderline personality disorder as a severe impairment at step two and by failing to address or analyze the disorder in combination with her other impairments, Miller argues the "ALJ failed to properly analyze [her] mental impairment because he failed to understand that [she] does not just suffer from Axis I disorders—she also suffers from an *Axis II disorder of borderline personality disorder*." Doc. 20 at 14 (emphasis in original). She contends, "The ALJ did not analyze the condition or even acknowledge that Ms. Miller suffered from the condition." Doc. 20 at 18.

Miller's argument fails. As the Commissioner observes, Miller, represented by counsel at the hearing before the ALJ, did not allege disability due to or in part to borderline personality disorder. *See* Doc. 23 at 9 (citing Tr. 37–38, 42–43, 312, 326–28, 365, 374); *see also Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010) (holding ALJ had no duty to consider a particular diagnosis because the claimant had been represented by counsel at the hearing before the ALJ but never alleged disability due to the diagnosis). But assuming the ALJ had to consider the diagnosis as part of

---

distractibility, decreased motivation, and hypersomnolence);

7. [Miller's] daily activities, such as [her] ability to do laundry and household chores, was the primary caretaker of her 6-year-old daughter, shopped twice a month, drove twice a week, rode in a taxi, watched television, walked her daughter to and from the bus stop, cooked, and paid bills (Tr. 56-58, 344-45, 750, 760);

8. Medical source statements, (Tr. 79-80, 83-85, 88-98, 102-04, 122-25, 128-30, 430, 698) such as from Dr. Saleh who indicated in 2012 that [Miller] had several maladaptive personality traits that were contributing to her difficulties and that nothing would make [Miller] well except for her open manifested desire to obtain Social Security disability benefits; the opinions dated 2013 of the state agency psychologists; and Dr. Taylor's note in December 2014 that [Miller] was minimizing her improved symptoms, emphasizing side effects in medications, and awaiting her disability determination;

9. [T]he effects of her impairments on her ability to work (Tr. 752, Finding no. 5) (accounting for the credible limitations that [Miller] alleged by including them in the RFC assessment).

Doc. 23 at 7–8.

20

his duty to carefully weigh all of the evidence, he did so, as detailed above and at least implicitly in the entirety of his decision. Miller has not shown his decision is a "broad rejection" that would not enable the Court to conclude he considered her "medical condition as a whole." *See Dyer*, 395 F.3d at 1211 (quoted).

Remand to reconsider Miller's diagnosis of borderline personality disorder is unwarranted.

## B.   *State Agency Medical Consultant Opinions*

Miller contends the ALJ erred in failing to reconcile Miller's RFC with opinions of state agency medical consultants. Doc. 20 at 18–22. The Commissioner disagrees. Doc. 23 at 12–18.

Regardless of its source, the Social Security Administration "will evaluate every medical opinion" it receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). Within the classification of acceptable medical sources are the following sources entitled to different weights: (1) a treating source, which is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you"; (2) a non-treating source, which is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you"; and (3) a non-examining source, which is "a physician, psychologist, or other acceptable medical source who has not examined you but provides a medical or other opinion in your case ... includ[ing] State agency medical and psychological consultants[.]"[21] 20 C.F.R. §§ 404.1502, 416.902. To decide the weight to give a medical opinion, the Social

---

[21]State agency medical and psychological consultants are highly qualified and "also experts in Social Security disability evaluation," 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i), and their opinions may be entitled to great weight if the evidence in the record supports them, Social Security Ruling ("SSR") 96-6p, 61 Fed. Reg. 34466, 34467–68 (July 2, 1996).

Security Administration considers examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. §§ 404.1527(c), 416.927(c).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). An ALJ's determination may be implicit, but the "implication must be obvious to the reviewing court." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983). Failure to explicitly state the weight given to an opinion is harmless if the opinion is consistent with the ALJ's decision and the decision is in-depth, shows thoughtful consideration of the findings, and does not leave the court wondering how the ALJ reached his decision. *Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016); *see also East v. Barnhart*, 197 F. App'x 899, 901 n.3 (11th Cir. 2006) (any error in failing to explicitly address consulting psychologist's report was harmless because observations in report were consistent with the ALJ's determination).

"[R]estricting the claimant to simple and routine tasks adequately accounts for restrictions related to concentration, persistence, and pace where the medical evidence demonstrates that the claimant retains the ability to perform the tasks despite limitations in concentration, persistence, and pace." *Timmons v. Comm'r of Soc. Sec.*, 522 F. App'x 897, 907 (11th Cir. 2013) (citing *Winschel*, 631 F.3d at 1180). Jobs with reasoning levels of two or three may be jobs with simple tasks. *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 873 (11th Cir. 2016).

In contending that the ALJ erred in failing to reconcile the RFC with opinions of state agency medical consultants, Miller complains the ALJ stated he was assigning some greater RFC limitations than Drs. Troiano and Pena assigned but failed to explain why he was rejecting some greater limitations they assigned; specifically, Dr. Troiano's opinion that Miller could not stand or walk for more than four hours and Dr. Pena's opinions that her capacity would vary depending on her mental state, she would have difficulty handling detailed instructions, and she might

have occasional difficulty retaining detailed instructions. Doc. 20 at 20–21. Regarding Dr. Troiano's opinions, Miller relies on SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983), which provides, "'Frequent' means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Doc. 20 at 20. Regarding Dr. Pena's opinions, Miller observes the Dictionary of Occupational Titles lists the jobs the ALJ found she can perform have a reasoning level of 2, requiring the ability to carry out detailed instructions.[22] Doc. 20 at 20; *see* Docs. 20-1–20-3.

Miller's arguments fail. Regarding Dr. Troiano's opinions, the ALJ stated the weight he was giving them ("some weight") and explained the reason for that weight (she is a "highly qualified" physician, she is an expert in disability claims under the Social Security Administration, she provided detailed explanations and rationales, and the medical records support her opinions, but medical evidence that postdated her opinions warrant greater non-exertional physical limitations). Tr. 758–59. Although the ALJ did not expressly explain why he was not including a limitation she could not sit or stand for more than four hours, he implicitly did so through a lengthy discussion of the medical evidence underlying the many physical limitations in the RFC beyond the limitation to light work (no climbing ladders and scaffolds; no work around unprotected heights or moving mechanical parts; no environment where there are temperature extremes; no crawling; no more than occasional climbing of ramps and stairs, and kneeling; no more than occasional use of foot controls and overhead reaching; no more than frequent balancing, stooping, and crouching; and a

---

[22]The Dictionary of Occupational Titles explains a reasoning level of 2 requires "[a]pplying commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal[ing] with problems involving a few concrete variables in or from standardized situations." Doc. 20-1 at 1.

sit/stand option).[23] *See* Tr. 752. Substantial evidence, as detailed in the Commissioner's brief, Doc. 23 at 6–7, supports the physical RFC.[24]

---

[23]The Commissioner cites 20 C.F.R. §§ 404.1567(b) and 416.967(b), which provide:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b) & 416.967(b). The Commissioner contends Miller's argument is meritless because the ALJ found she can do less than a full range of light work but SSR 83-10 (the ruling on which Miller relies) addresses the requirements for a full range of light work. Miller's argument fails for this additional reason.

[24]The Commissioner details the following evidence supporting the physical limitations of the RFC:

1. Medical history;

2. Medical signs, such as the January 2014 follow-up examinations by Coastal Spine & Pain Center showing [Miller's] general examination was unremarkable (Tr. 672-73, 675, 757); December 2014 and March 2015 evidence of decreased range of motion in the lumbar spine in all directions with pain and paravertebral tenderness and an antalgic gait but with 5/5 strength and her ability to heel/toe walk with pain but without deficit (Tr. 634, 646, 757); May 2015 evidence of limited musculoskeletal range of motion, tenderness to palpation of paraspinal muscles bilaterally and cervical and lumbar facet loading pain (Tr. 629, 758); by October 2015, her general examination was unremarkable and in November 2015, she had taut muscle bans, muscle spasms in the low back and neck, and lumbar paraspinal tenderness (Tr. 727, 758);

3. Laboratory findings, such as a February 2014 normal EMG of the lower extremities (Tr. 690-92, 757); a February 2014 EMG of the paralumbar spine that suggested an old/chronic bilateral L5 radiculopathy with no acute changes (Tr. 690-92, 757); a March 2014 MRI of the lumbar spine that revealed only mild straightening of the normal lumbar lordosis and mild central canal and neural foraminal narrowing at L4-5 (Tr. 614-15, 757);

4. The effects of treatment, such as [Miller]'s indication in September 2014 that Percocet helped reduce her back pain (Tr. 652, 757); her March 2015 admission that Hydrocodone helped reduce her back and neck pain (Tr. 634, 757); her May 2015 report of 60 percent improvement after a lumbar medical branch block (Tr. 630, 757);

Regarding Dr. Pena, the ALJ stated the weight he was giving his opinions ("some weight") and explained the reason for that weight (he is a "highly qualified" physician, he is an expert in disability claims under the Social Security Administration, and the medical record supports his opinions, but medical evidence that postdated his opinions warranted greater limitations on social functioning). Tr. 759. As the Commissioner observes, Dr. Pena's opinions on which Miller relies do not constitute Dr. Pena's ultimate opinions, Doc. 23 at 17, and those ultimate opinions (Miller "is mentally capable of performing simple, work related tasks that do not interfere with possible physical limitations," Tr. 130) accord with the ALJ's RFC (limiting her to "simple tasks" and "simple work-related decisions," Tr. 752) and jobs requiring a reasoning level of 2, *see Chambers*, 662 F. App'x 869, 873.

Remand to reconsider the state agency medical consultant opinions is unwarranted.

## C.   Dr. Taylor's Opinions

Miller contends the ALJ failed to provide good cause to reject Dr. Taylor's opinions. Doc. 20 at 22.

---

5.    Reports of daily activities, such as [Miller]'s testimony that she could sit 2-3 hours at one time, stand 30-45 minutes at one time, and lift/carry two grocery bags full of cans (Tr. 42, 48, 52-53, 753); did laundry and household chores, was the primary caretaker of her 6-year-old daughter, shopped twice a month, drove twice a week, rode in a taxi, watched television, walked her daughter to and from the bus stop, cooked, and paid bills (Tr. 56-58, 344-45, 760);

6.    Recorded observations such as [Miller]'s indication of functional improvement in September 2014, December 2014, and in May 2015 (Tr. 629, 652, 757, 758); [and]

7.    Medical source statements, such as the opinion from state agency physicians (Tr. 80, 126-27, 150-51, 758).

Doc. 20 at 6–7.

The regulations and case law set forth a general preference for treating sources' opinions over those of non-treating sources, and those of non-treating sources over those of non-examining sources. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985). But an ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41. The Eleventh Circuit has emphasized, "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

Opinions on issues that are dispositive of a case, such as whether a claimant is disabled or able to work—even from a treating source—are not medical opinions because they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

The ALJ provided good cause to give only some weight to Dr. Taylor's opinions in the February 2013 Mental Impairment Questionnaire. As the ALJ explained, Dr. Taylor opined Miller has severe restrictions, but the level of severity was contrary to the objective medical evidence,[25] to Miller's activities of daily living,[26] to treatment

---

[25]In summarizing the medical evidence from Dr. Revollo earlier in the opinion, the ALJ observed the exams "do not document any musculoskeletal or psychiatric abnormalities." Tr. 756. Though not specifically cited by the ALJ, one treatment note from Dr. Revollo appears to state, "I disagree with the longterm [sic] diagnoses she demands make her 'unable to work.'" Tr. 507. In the same treatment note, Dr. Revollo lists "anxiety, see psych, takes [or taking] valium." Tr. 507.

[26]The ALJ observed that Miller performs a variety of activities of daily living that undermine the severity of her limitations as opined by Dr. Taylor (doing laundry and household chores, being the primary caretaker of her 6-year old daughter, shopping, driving twice a week, occasionally taking a taxi, watching television, walking her daughter to and

notes until December 2015, to the "routine" treatment Dr. Taylor provided, to Miller's history of partial compliance with medications and outpatient counseling, and to the absence of hospitalizations or emergency visits for mental-health-related symptoms. *See* Tr. 759. The ALJ also provided good cause to give little weight to Dr. Taylor's opinions in the letter, Medicaid form for taxi transportation, and verification forms: Dr. Taylor did not state specific limitations in them, and whether Miller can work is an issue for the ALJ. *See* Tr. 759.

In contending the ALJ failed to provide good cause to reject Dr. Taylor's opinions, Miller points to several instances in which Dr. Taylor opined Miller could not work and contends that even though the ultimate disability decision is reserved to the Commissioner, "the collective nature of these opinions over a several year period by two treating sources indicated that the ALJ's opinion as to functioning was not shared by the medical professionals who were treating Ms. Miller."[27] Doc. 20 at 23. Miller explains those opinions, consistent with GAF ratings in the 30s and 40s and the diagnosis of borderline personality disorder, show Miller cannot sustain employment. Doc. 20 at 22.

While the ALJ could have given greater weight to Dr. Taylor's opinions for the reasons Miller provides, that is not a reason for reversal given that the ALJ provided good cause supported by substantial evidence to give lesser weight to them. *See Moore*, 405 F.3d at 1211 (the court may not reweigh evidence or substitute its judgment for the Commissioner's judgment); *Martin*, 894 F.2d at 1529 (a court must affirm an ALJ's decision if substantial evidence supports it, even if other evidence preponderates against the factual findings).

---

from the bus stop, cooking, and paying bills). Tr. 759.

[27]The other treating source to which Miller refers is Dr. Revollo. Doc. 20 at 22. Miller twice refers to Dr. Revollo's opinions that Miller could not work, Doc. 20 at 22–23, but does not challenge the ALJ's rejection of Dr. Revollo's opinion (the heading of the argument is titled "In violation of applicable law, the Commissioner failed to articulate good cause for rejecting the treating psychiatrist's opinion as to functioning"). *See* Doc. 20 at 22–25.

Miller also argues the ALJ "missed the point" of Dr. Taylor's December 2015 note about Miller only partially complying with treatment, contending perfect compliance does not equate to no disability and her mental condition is characterized by instability. Doc. 20 at 24–25. But the ALJ did not contend perfect compliance would equal no disability; rather, the ALJ pointed it out as one of many reasons in the record for finding Miller not disabled.

Miller further argues, "It appears that the ALJ was 'playing doctor' by presuming that one needs to engage in activities with a 'high probability of painful consequences' which does not even make sense." Doc. 20 at 24. The ALJ was not playing doctor by presuming one must engage in such activities; rather, the ALJ appeared to note that because Dr. Taylor had specifically included in a checklist on the 2013 mental questionnaire that Miller showed "involvement in activities that have a high probability of painful consequences which are not recognized." Tr. 598.

Remand to reconsider Dr. Taylor's opinions is unwarranted.

## VI.   Recommendations[28]

Because the ALJ applied the correct legal standards and substantial evidence supports his decision, I recommend:

(1)   affirming the Commissioner's decision;

(2)   directing the Clerk of Court to enter judgment for Nancy A. Berryhill and against Hope Leann Miller under sentence four of

---

[28]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." Id. A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. See Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

42 U.S.C. §§ 405(g) and 1383(c)(3) and affirming the Commissioner's decision; and

**(3)** directing the Clerk of Court to close the file.

**Entered** in Jacksonville, Florida, on August 15, 2018.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   The Honorable Marcia Morales Howard
     Counsel of Record